# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | |
|---|---|
| DENISE LEWIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Cause No. 2:12-cv-241-PPS |
| v. | ) |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

It's a fundamental tenet of social security judicial review cases that the ALJs determine the facts, and I can only reverse them on that issue if they commit manifest error. They're the ones who listen to the testimony, observe the demeanor of witnesses, and assemble the record in the first instance. Because they are intimately familiar with the nitty-gritty details, in almost all cases, I must defer to their understanding of the facts of the case.

The matter now before me invokes this basic principle. Denise Lewis objects to the agency decision denying her application for social security benefits on a number of grounds, but they mostly amount to one main contention – that the ALJ found the wrong facts. More specifically, she raises a number of arguments involving the opinion of a single physician, which (she says) undercuts the ALJ's decision to such a degree that I must reverse. The problem with this assertion is that the ALJ specifically addressed that doctor's opinion and explained quite well why it didn't deserve much weight. That's good enough for my purposes. And her remaining assertions fare no better. I understand that Lewis quibbles with several other of the

1

ALJ's factual determinations, especially regarding what (and who) the ALJ thought was credible, and what he didn't. But that's not grounds for reversal.

Therefore, and for the reasons explained below, the Social Security Administration's final decision is **AFFIRMED**.

## Background

The facts and circumstances surrounding Lewis's social security appeal are described sufficiently in the ALJ decision, so only a brief summary of the relevant highlights is warranted. Lewis was born in 1956, which makes her 54 years old at the time of the ALJ's decision. (R. at 41.) She was diagnosed with multiple sclerosis in 2002, which had caused problems with her vision and balance, and which has resulted in difficulty using her right arm and leg. (*Id.* at 41-42.) Her last flare-up was in February 2009. (*Id.* at 42.) She also reports a host of other problems including nausea, vertigo, memory lapses and depression. (*Id.* at 48-54.)

Lewis worked as a customer service representative until 2007, when she got married and moved from Ohio to Illinois. (*Id.* at 41.) She was offered a job in Chicago in 2008 but turned it down because she didn't think that it was feasible due to her health problems. (*Id.* at 51.) There's nothing in the record suggesting that her condition deteriorated between 2007 and 2008 to such a degree that she couldn't work in the new job.

In his opinion denying Lewis' appeal, the ALJ undertook the traditional five step analysis governing social security disability appeals. *See* 20 C.F.R. §§ 404.1520. At Step Two, he determined that Lewis has the following severe impairments: MS, a history of fracture of the left shoulder and wrist, anemia and obesity. (*Id.* at 25.) Notably, he didn't find that fatigue was an impairment (either severe or non-severe). At Step Three, the ALJ acknowledged that MS *can* be

2

one of the impairments that will result in an automatic finding of disability (*Id.* at 26), but only if it causes one of the following:

> A. Disorganization of motor function as described in 11.04B; or
>
> B. Visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02; or
>
> C. Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process.

20 C.F.R. Part 404, Subpart P, Appx. 1, Listing 11.09. Because the ALJ concluded that Lewis's MS didn't cause any of these 11.09 symptoms, he found that she was not automatically disabled under the Step Three analysis. (R. at 26.)

At Step Four, the ALJ determined that Lewis had the RFC to perform sedentary work. (*Id.*) He did impose several limitations, including never climbing ladders, ropes or scaffolds, only occasionally climbing ramps and stairs, and occasionally kneeling, crouching, crawling, balancing and stooping. (*Id.*) During this analysis, the ALJ discussed a number of medical providers and their opinions. Most relevant to this case, he specifically addressed the opinion of Dr. James Connors, M.D., who treated Lewis on three occasions and opined (on her last visit) that she had significant and persistent disorganization of motor function in two extremities. (*Id.* at 29-30.) Notably, the full extent of Dr. Connor's opinion in this regard is in two-pages[1] of a four-page questionnaire and a two page letter that mostly recounts Lewis's self-reported symptoms. (*Id.* at 554-57.) The ALJ explained that he was giving Dr. Connors's opinion little

---

[1] Lewis also argues that the SSA erred when it failed to consider O'Connor's full report on reconsideration. (DE 13 at 24-25.) As I'll discuss below, I don't think that it did, but even if so, it wouldn't matter with respect to the ultimate outcome in the case.

weight because (a) his last report indicated only modest exacerbation of symptoms from her first visits, (b) his opinion was inconsistent with his treatment notes, and (c) he relied heavily on her own subjective reports with little independent verification of whether they were accurate. (*Id.* at 30.)

The ALJ noted that Lewis described a number of significant symptoms, specifically including an inability to sit or stand for more than ten or fifteen minutes at a time, but after a detailed discussion of these alleged symptoms, he ultimately concluded that her reported severity wasn't credible. (*Id.* at 29.) He specifically based this finding on the fact that Lewis didn't show any exacerbation in her symptoms since February 2009, nor did she demonstrate any difficulties with sitting, standing or speaking during her numerous treatment visits. (*Id.* at 29.) The ALJ also took notice of the fact that Lewis quit her job in 2007 because of marriage and not health reasons. (*Id.*) Finally, he cited her ability to engage in a number of daily activities without the use of a cane or walker as further support that her account of her impairments and symptoms was overstated. (*Id.*)

At the Step Five analysis, the ALJ determined that given Lewis's RFC and resulting limitations, she was qualified to perform her past work as a customer service representative and systems programmer. (*Id.* at 31.) Therefore, he concluded she was not disabled, and her DIB application was denied. (*Id.* at 32.)

**Discussion**

If an ALJ's findings of fact are supported by "substantial evidence" then they must be sustained. *See* 42 U.S.C. § 405(g). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nelms v. Astrue,* 553 F.3d

4

1093, 1097 (7th Cir. 2009) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Review of the ALJ's findings is deferential. *See Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). In making a substantial evidence determination, I must review the record as a whole, but I can't re-weigh the evidence or substitute my judgment for that of the ALJ. *Id*.

"Although this standard is generous, it is not entirely uncritical." *Id*. at 462 (*quoting Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002)). I must ensure that the ALJ has built a "logical bridge" between the evidence and the result. *See Getch v. Astrue*, 539 F.3d 473, 481 (7th Cir. 2008). However, if reasonable minds could differ on whether a claimant is disabled, I should affirm the decision denying benefits. *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

### Dr. Connor's Opinion

Lewis asserts five principal arguments as to why I should reverse or remand. Three of them fundamentally involve the opinion of Dr. Connor. First, she says, the ALJ erred in his Step Three analysis when he (essentially) disregarded Dr. Connor's opinion that she was suffering from severe and persistent disorganization of motor functions in two extremities and concluded that the 11.09 criteria were not met. (DE 13 at 17-18.) Second, Lewis argues that the ALJ improperly rejected Dr. Connor's opinion at the Step Four analysis despite the fact that he was (she claims) her treating physician.[2] (*Id.* at 17-22.) Third, Lewis contends that the SSA erred when it failed to consider new evidence on reconsideration, which consisted of two pages of a

---

[2] The question of whether or not Dr. Connor was a treating physician is important because if he was, then his opinion must be given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *accord White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005).

5

report by Dr. Connors detailing Lewis's specific alleged functional limitations that were inadvertently omitted during the administrative hearing. (*Id.* at 24-25.)

These arguments fail for a number of reasons. First and foremost, it's not entirely clear to me that Dr. Connor was, in fact, a treating physician. The record before me indicates that he saw her precisely three times from September 2009 to March 2010, and the main purpose of the last of these visits seems to have been for Dr. Connor to fill out a report to the SSA concerning her potential disability. There's no indication that she saw him again in the year between the March 2010 visit and her March 2011 hearing before the ALJ.

Federal regulations set forth the factors that the SSA will consider when determining whether a particular doctor is a treating physician:

> Generally, we will consider that [an applicant] ha[s] an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that [the applicant] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the applicant's] medical condition(s). We may consider an acceptable medical source who has treated or evaluated [the applicant] only a few times or only after long intervals (*e.g.*, twice a year) to be [the applicant's] treating source if the nature and frequency of the treatment or evaluation is typical for [the applicant's] condition(s).

20 C.F.R. § 404.1502. In other words, the main question that the ALJ – and ultimately I – must confront when addressing whether a particular doctor is a treating physician is the ongoing nature of his or her relationship with the applicant.

Now, it's certainly true that seeing a doctor a couple of times a year can constitute a treating relationship *if the patient intends to keep visiting the physician on an ongoing basis*. *See, e.g., Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009) (noting that the ongoing nature of a doctor-patient relationship is critical to the treating physician analysis); *White*, 415 F.3d at 658

(same). But courts generally hold that a doctor who merely provides an opinion in connection with a social security disability application isn't a treating physician. *See, e.g., Simila*, 573 F.3d at 514; *Snell v. Apfel*, 177 F.3d 128, 133 (2nd Cir. 1999). And given the timing of Lewis's visits to Dr. Conner and her DIB application – *i.e.*, she saw him twice within two months of applying, and then returned three months later to have him fill out his report – it looks to me like that's basically what was going on here. It certainly doesn't seem like she intended to establish an ongoing treating relationship with Dr. Connor.

In any event, my conclusion would not change even if Dr. Connor was Lewis's treating physician. The general rule that treating physicians' opinions should be given controlling weight isn't absolute. Indeed, the federal regulation governing the issue itself acknowledges that a treating physician's opinion may be trumped if it is "inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2). At the end of the day, that's what the ALJ found in this case. He specifically addressed Dr. Connor's March 2010 opinion (the only one supporting Lewis's claim of MS-related disability) in some detail in his decision, noting that despite its cursory findings of significant fatigue and impaired motor functions, Dr. Connor didn't report any exacerbation of symptoms since her earlier visits. (R. at 29-30.) The ALJ also pointed to Dr. Connor's treatment notes from prior visits, which substantially undercut his topline findings. (*Id.* at 30.) Finally, the ALJ surmised that Dr. Connor seemed to be relying very heavily on Lewis's self-reported symptoms and limitations, and not confirming them or otherwise assessing her condition through an independent examination. (*Id.*) Based on all of this, he elected to give Dr. Connor's opinion very little weight. (*Id.* at 29.)

That's good enough for me, regardless of whether or not Dr. Connor was Lewis's treating physician (though again, I don't think he was). As noted above, my job when reviewing an ALJ and agency decision is not to let the parties relitigate the facts of the case. Instead, it's simply to make sure that the ALJ has acknowledged and incorporated all relevant evidence and limitations into his analysis. *See, e.g., Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003); *Begley v. Astrue*, No. 1:10-cv-01113-SEB-TAB, 2011 WL 3739339, at *4 (S.D. Ind. Aug. 23, 2011) (explaining the point of *Kasarsky* and similar cases). If he or she has done that, then I generally must affirm the decision.

It seems clear to me that in this case the ALJ adequately addressed and acknowledged Dr. Connor's opinion about the severity of Lewis's MS symptoms. He recognized that a portion of the opinion – at least arguably – contradicted his conclusions at the Step Three and Step Four stages of the analysis, but he explained why he didn't think it deserved much weight. He gave several reasons why he took that route, each of which seems more or less plausible and supported in the record. I certainly can't say that this factual determination was "patently wrong," which I would be required to do in order to reverse or remand the matter. *See Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008).

This conclusion necessarily resolves Lewis's second argument – that the ALJ erred when he determined that the 11.09 listed impairment criteria weren't met during his Step Three analysis. That's because the *only* evidence that the severity of Lewis's MS was sufficient to meet this requirement comes from Dr. Connor's opinion. And because the ALJ concluded that Dr. Connor's report is entitled to little weight, there is nothing left to the Step Three argument.

That takes me to the argument that the SSA improperly disregarded "new" evidence when it failed to consider two pages of Dr. Connor's report dated March 4, 2010. The first thing to say is that it seems unlikely to me that these documents would have altered the decision by the ALJ to minimize Dr. Connor's opinion. Nothing in them explains an exacerbation of symptoms from Lewis's earlier visits, nothing explains the deviation from Dr. Connor's prior treatment notes, and they convey the same self-reported character as does the portion of the report that was presented at the hearing. (R. at 131-32.) So I see no reason why these two pages would make any difference in the ALJ's ultimate conclusion.

Furthermore, I'm fundamentally unconvinced that these documents are new, at least as that term is used in this context. In general, evidence that wasn't submitted to the ALJ (or other factfinder) may not be considered during a subsequent review of his or her decision. *See Eads v. Sec'y of Dep't of Health and Human Servs.*, 983 F.2d 815, 816-18 (7th Cir. 1993). That said, there is a limited exception to this rule that allows "new and material" evidence, which may be introduced at the agency reconsideration stage of the administrative review process. *Id.* at 816-17; 20 C.F.R. § 404.970(b). However, this evidence must actually be *new* – in other words, it must have been "not in existence or available to the claimant at the time of the administrative proceeding." *Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir.1993); *accord Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). The problem in this case should be self-evident. How could the missing pages of the report in question be "not in existence" at the time in question when the rest of the report was, in fact, submitted? Obviously, they couldn't.

I'm certainly sympathetic to the fact that mistakes happen, especially in cases like these involving hundreds of pages of dense and oftentimes confusing medical reports. And I'm

generally hesitant to penalize a social security applicant for a clerical snafu. If I thought that the missing pages of Dr. Connor's report would have made a difference in this case, I might be more inclined to remand the matter so that the ALJ could consider them. But as I explained above, my general impression is that these are just more of the same opinion that the ALJ emphatically rejected, seemingly for a convincing reason. Therefore, this argument has no merit either.

### Fatigue, Vision and Memory/Concentration Problems; Lewis's Credibility

Lewis's final two arguments are closely related. She first claims that the ALJ failed to consider three impairments or symptoms – her purported fatigue, vision problems and concentration/memory issues – when determining her RFC during the Step Four analysis. (DE 13 at 15-19.) Her second argument is that the ALJ generally erred when assessing the credibility of Lewis's self-reported severity of her impairments, especially including the fatigue that she claimed to be experiencing. Neither one of these arguments warrants reversal or remand.

I don't need to spend much time on the first of these. Perhaps the best thing to say about it is that it's belied by the ALJ decision itself. Indeed, in his Step Four analysis, the ALJ *repeatedly* acknowledged that all of these symptoms or impairments were reported by Lewis or – in some cases – observed by her doctors. (R. at 27-29.) It's not that he didn't consider them; it's just that he thought that their alleged severity was inconsistent with the other evidence in the record.

For example, with respect to Lewis's purported fatigue, the ALJ acknowledged on multiple occasions that she claimed to only be able to sit or stand for ten or fifteen minutes at a time. (*Id.* at 27, 29.) However, he went on to note that this self-reported severity was inconsistent with both her doctors' treatment notes (which fail to indicate that level of difficulty

standing or sitting) and her daily activities report (which indicates that Lewis doesn't need a cane or walker, and that she engages in numerous daily tasks requiring standing or sitting). (*Id.* at 29.) As for her purported vision problems, the ALJ decision explains that she either reported that they had improved (*Id.* at 27), or to the extent she reported they hadn't, that purported impairment was mostly addressed by Dr. Connor's report, which – as discussed extensively above – the ALJ gave little weight. (*Id.* at 29-30.)

As for Lewis's second and more general claim that the ALJ erred when assessing the credibility of her self-reported symptoms, a similar result applies, though it probably requires a little more discussion. (DE 13 at 22-24.) Lewis first argues that the fact that her doctors didn't specify that she could only sit or stand for ten minutes or so at a time doesn't mean that they think she could do so for longer. This line of reasoning is a non sequitur because it misconstrues the ALJ's decision. The ALJ didn't interpret the doctors' silence on how long Lewis could stand or sit to mean that she had no limitations in that regard; to the contrary, he relied on specific opinions from two medical providers affirmatively indicating that she *could* sit or stand for a much more extended period of time (*e.g.*, up to six hours in an eight hour day). (R. at 30.)

Lewis goes on to assert a more serious objection when she attacks the ALJ's reliance on her ability to perform various activities of daily living to conclude that her self-reports of severe fatigue and other similar symptoms were less than credible. As she correctly notes, the Seventh Circuit generally disfavors the argument – frequently made by ALJs – that a social security disability applicant is not disabled because he or she can perform various mundane day-to-day domestic tasks. *See, e.g., Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *accord Hughes*

11

*v. Astrue*, 705 F.3d 276, 278-79 (7th Cir. 2013). But that glosses over a subtle distinction between two seemingly similar lines of reasoning.

The point of *Bjornson* and the other similar Seventh Circuit decisions is that the workplace is a fundamentally different environment than a household. *See Bjornson*, 671 F.3d at 647. The fact that someone can do their laundry or cook dinner on their own schedule and at their own leisure, without any deadlines or job-related time pressures, doesn't mean that they would be able to hold a much more inflexible paid job. *Id.* Here, in contrast, the ALJ didn't cite Lewis's ability to perform daily tasks as proof she was *de facto* not disabled and could hold a job. Instead, he merely pointed to those activities as evidence that she wasn't physically limited to standing or sitting for a handful of minutes at a time. That should make perfect sense because, after all, she almost certainly would need to be able to sit and/or stand for much longer to do them. That's a crucial difference between the two scenarios, and one that separates this case from cases like *Bjornson* and *Hughes.*

Reading between the lines, Lewis's main problem with the ALJ decision isn't so much that he failed to consider her self-reported symptoms of fatigue, vision problems and concentration/memory impairment. Rather, it's that he acknowledged that these symptoms existed to some degree but ultimately concluded that they just weren't as debilitating as Lewis claimed (or as she reported to some of her doctors). I understand and empathize that Lewis thinks that the ALJ blew this particular call. But this sort of credibility-based determination and weighing of the evidence is a job for the ALJ, and not me. *See Overman*, 546 F.3d at 462.

## CONCLUSION

Therefore, and for all of the foregoing reasons, the final decision of the Commissioner of Social Security denying plaintiff's application for disability insurance benefits under Title II of the Social Security Act is AFFIRMED.

The Clerk shall enter judgment accordingly.

**SO ORDERED**.

ENTERED: August 30, 2013.

                                             /s/ Philip P. Simon
                                             PHILIP P. SIMON, CHIEF JUDGE
                                             UNITED STATES DISTRICT COURT